1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UMG RECORDINGS, INC., et al.,  .    Civil Action No. 1:18cv957
                               .
                Plaintiffs,    .
                               .
     vs.                       .    Alexandria, Virginia
                               .    June 25, 2021
TOFIG KURBANOV, et al.,        .    10:07 a.m.
                               .
                Defendants.    .
                               .
. . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFFS:            SCOTT A. ZEBRAK, ESQ.
                              LUCY GRACE D. NOYOLA, ESQ.
                              Oppenheim + Zebrak, LLP
                              4530 Wisconsin Avenue, N.W.
                              5th Floor
                              Washington, D.C. 20015


FOR DEFENDANT KURBANOV:        VALENTIN D. GURVITS, ESQ.
                              Boston Law Group, PC
                              825 Beacon Street, Suite 20
                              Newton Centre, MA 02459
                                and
                              JEFFREY H. GEIGER, ESQ.
                              Sands Anderson PC
                              1111 E. Main Street, Suite 2400
                              Bank of America Plaza
                              P.O. Box 1998
                              Richmond, VA 23218-1998


(Pages 1 - 32)


(Proceedings recorded by FTR Gold electronic sound recording,
 transcript produced by computerized transcription.)

2

1   TRANSCRIBER:                        ANNELIESE J. THOMSON, RDR, CRR
                                        U.S. District Court, Third Floor
2                                       401 Courthouse Square
                                        Alexandria, VA 22314
3                                       (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                   P R O C E E D I N G S

 2              THE CLERK:  UMG Recordings, Inc., et al., versus

 3    Kurbanov, et al., Case 18cv957.  Counsel, please note your

 4    appearances for the record.

 5              MR. ZEBRAK:  Scott Zebrak --

 6              THE COURT:  Good morning.

 7              MR. ZEBRAK:  -- counsel for plaintiffs.

 8              Good morning, Your Honor.  With me is my colleague,

 9    I'd like to introduce Lucy Noyola.

10              THE COURT:  All right, good morning.

11              MR. GURVITS:  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MR. GURVITS:  Hal Gurvits for the defendant,

14    Mr. Kurbanov, and our local counsel, Jeffrey Geiger, is here as

15    well.

16              THE COURT:  All right, good morning.

17              All right, this is on the plaintiffs' motion to

18    compel.  Do you have anything to add?  I've read your reply.

19              MR. ZEBRAK:  I'm obviously prepared to answer

20    anything within the papers, Your Honor.

21              THE COURT:  But my question, I guess, is, you know, I

22    have the defendant's declaration, but it seems to me that what

23    I really need, and I'd like the parties to correct me as to

24    whether I'm wrong on this, I certainly would feel more

25    comfortable before making the decision, it seems to me that I
```

4

1   need a declaration from the web hosting company as to what

2   their capabilities are in terms of, of recording this

3   information and how much it would cost to preserve it, or do

4   you think that this is something that is totally within the

5   control of the defendant and not also within the control -- I

6   mean, I can understand that yes, it is probably within the

7   control of the defendant, but is it also within the control of

8   the web hosting company?

9           MR. ZEBRAK:  So I think there's a little confusion.

10  If I can unpack that, Your Honor?

11          THE COURT:  Sure, if you could, because I'm not the

12  most, you know --

13          MR. ZEBRAK:  I understand.

14          THE COURT:  Actually, if I were 25, I would

15  understand this better.

16          MR. ZEBRAK:  So I spend a lot of time with

17  technology, and sometimes it's intuitive; sometimes it's not.

18          THE COURT:  Well, I can guarantee you it's not

19  intuitive with me.

20          MR. ZEBRAK:  Well --

21          THE COURT:  My children tell me all the time how, how

22  I don't understand things.  My husband and I have said we

23  really can't retire because we won't have an IT department

24  anymore, but --

25          MR. ZEBRAK:  Sometimes it's nice being off of the

1  grid, Your Honor.

2       THE COURT:  Yeah, it is.

3       MR. ZEBRAK:  So, you know, I think one of the reasons

4  actually why the situation appears complicated is the result of

5  the defendant's briefing, which I think unnecessarily confused

6  the matter.

7       THE COURT:  Okay.

8       MR. ZEBRAK:  So I'd like to say at the outset that

9  this is purely within the defendant's control in two different

10 ways, and I'd like to make sure that I explain each of them --

11      THE COURT:  Please.

12      MR. ZEBRAK:  -- but let me if I can just explain the

13 sort of background, because if we don't get that straight, then

14 the rest of the conversation will have a -- be on a tenuous

15 foundation.

16      THE COURT:  Okay.

17      MR. ZEBRAK:  So defendant, as we all know, runs at

18 least two websites that, that are these stream revenue

19 websites, and as end users, you know, people that just go visit

20 a website, we're familiar with the front end of the website,

21 but, of course, there's a back end of a website, too, and what

22 happens is the front end of the website -- and I think our

23 reply does a, does a good job of explaining the areas that the

24 defendant addressed that are actually irrelevant to our motion,

25 and that includes defendant talking about his web host, the

1    defendant talking about his website software, and the defendant

2    talking about the video files.

3          All of that -- I mean, obviously, those are

4    components of his, you know, big, complex service, but for our

5    motion, none of that's really relevant.  What's relevant for

6    our motion is what's called the, the web server software and

7    what's called remote logging through an entity called Yandex,

8    Y-a-n-d-e-x.

9          So let me, let me take a step back and explain a

10   little bit more about that.

11         THE COURT:  Okay.

12         MR. ZEBRAK:  So a website operator, most website

13   operators pay attention to what's happening on their site in

14   some way, shape, or form.

15         THE COURT:  Sure.

16         MR. ZEBRAK:  Otherwise, it will shut down.

17         THE COURT:  Sure.

18         MR. ZEBRAK:  A million reasons why.  So when you run

19   a website, you have something called a web server.

20         THE COURT:  Right.

21         MR. ZEBRAK:  A web server is what receives -- and,

22   you know, if I go visit Facebook, I click a page, you know,

23   information goes back and forth --

24         THE COURT:  Right.

25         MR. ZEBRAK:  -- and the web server is what receives

1   information from the user, processes it, and spits something

2   back out.

3            THE COURT:  That I, I did understand.

4            MR. ZEBRAK:  Okay.  So that's the web server, okay?

5   Web server software, we have an expert that put in really an

6   uncontested declaration that we think also lays this out pretty

7   clearly.  We believe the defendant, though he chose not to, to

8   confirm this in his declaration, we believe he uses a web

9   server software called NGINX.  It's spelled N-G-I-N-X.

10           Well, that web server software -- and really all the

11  common web server softwares have a built-in capability for

12  logging the requests that come in, that are processed and go

13  back out, and it's built in because it's, it's what websites

14  do.  They track this stuff.  It's --

15           THE COURT:  I kind of thought that it would probably

16  be basically a turn on/turn off kind of thing.

17           MR. ZEBRAK:  It's a -- you may see the

18  word "configured," I believe the defendant used.  It's a fancy

19  way for saying turning a dial, flipping a switch.

20           THE COURT:  Right.

21           MR. ZEBRAK:  It's a configuration.  It's a setting.

22           THE COURT:  Yes.

23           MR. ZEBRAK:  Much in the way that you may set your

24  temperature control in your house.

25           THE COURT:  Right.

8

1          MR. ZEBRAK:  I'm distinguishing that from the web

2   host --

3          THE COURT:  Okay.

4          MR. ZEBRAK:  -- which is what the defendant

5   introduced, this German-based entity.

6          The web host may be where stuff is being stored, it

7   may be where he's being connected to the internet through, but

8   the actual software that has this logging capability --

9          THE COURT:  Okay.

10          MR. ZEBRAK:  -- has a built-in feature for that.

11          THE COURT:  All right.

12          MR. ZEBRAK:  And that's what I mean by we don't need

13   a declaration or testimony from any third party, and the fact

14   the defendant, despite, you know, voluminous amount of paper

15   and the declaration and all this and that, he doesn't dispute

16   that the software he uses for his web server has a built-in

17   capability to flip a switch and turn it on.

18          As far as I'm aware, it's entirely undisputed, and it

19   would be shocking if it were to be disputed because he didn't

20   build his own web server software, and really the common widely

21   used stuff out there all has this built-in functionality.  So

22   that's why I think it's purely within his control.

23          Now, that's what is called local logging.

24          THE COURT:  Okay.

25          MR. ZEBRAK:  Local meaning it's local.  It's kind of

1    within your fingertips.

2         Another form of logging happens at -- where the user

3    interacts with the website, okay?  So web server software is

4    kind of the back end to a website.  The idea is you kind of

5    pass through the front door, but it's your back end receiver

6    that receives, processes, and returns things.

7         THE COURT:  Right.

8         MR. ZEBRAK:  So that's what we talked about with

9    NGINX and -- you know, that's the thrust of our motion.  Flip a

10   switch, very common.

11        THE COURT:  Right.

12        MR. ZEBRAK:  It's what was in the *Bunnell* case.

13        And what we've also realized through this case is

14   that at the website interface, another form of logging is

15   called remote logging, where website operators, apart from

16   what's kind of standard built in their web server software,

17   they also can choose what fields of information to log and have

18   sent to an analytics company.  Your Honor is obviously familiar

19   with Google.

20        THE COURT:  And this would be -- this kind of may

21   feed into my question where I may be wrong is that sort of

22   information would be held by the web server company, is that

23   correct, or is that incorrect?

24        MR. ZEBRAK:  It would be on their computer system --

25        THE COURT:  Right.

1          MR. ZEBRAK:  -- but let me, let me expand on that

2     just a little bit.

3          THE COURT:  Okay.

4          MR. ZEBRAK:  It would be when you say held by the,

5     the company --

6          THE COURT:  Or within the capability of the web

7     server company.

8          MR. ZEBRAK:  Well, yeah, but held in the way that

9     Your Honor may have an e-mail account outside the U.S. court

10    system.  Let's say you have it with Yahoo or you have some

11    other online account.  Well, technically, the data resides not

12    on Your Honor's computer.

13         THE COURT:  Right.

14         MR. ZEBRAK:  It resides elsewhere, but you have

15    access to it.

16         THE COURT:  Right.

17         MR. ZEBRAK:  And, and so what happens is many website

18    operators sign up for these analytics services.  Some of them

19    are free; some of them are paid.

20         Google Analytics is a very well known one.  Everyone

21    knows of Google in the United States.

22         There's a foreign company named Yandex, Y-a-n-d-e-x,

23    that the defendant uses, again, undisputed.  We've, we've laid

24    it out, hasn't been contested.

25         THE COURT:  Okay.

1          MR. ZEBRAK:  And, in fact, not only that; the

2    defendant in the course of this case has submitted when he

3    opposed personal jurisdiction, he went to his account in

4    Yandex.  Yandex solicits customers, free or paid, by giving

5    customers the ability to send information to them by plugging

6    code in on their website so that when visitors visit your

7    website, information gets tracked and sent to this company so

8    that it can report on it and do analytics on it.

9          The defendant went to his Yandex account and opposed

10   personal jurisdiction by attaching to his declaration a report

11   that talked about where traffic comes from, users in different

12   countries, and that all is happening, Your Honor, because the

13   defendant on his website plugs in codes so that when Your Honor

14   visits, not that Your Honor is going to a stream-ripping

15   website, but if someone were to visit his site, information

16   goes to the defendant interacting with his server, but because

17   there's code on his website, information goes to this analytics

18   company called Yandex.

19          THE COURT:  Right.

20          MR. ZEBRAK:  And also for the advertising companies

21   that work with him, he plugs them in for the ad companies that

22   he wants to do business with, information goes to them.

23          THE COURT:  Yes.

24          MR. ZEBRAK:  So let me take it back to the purpose of

25   our motion for a moment against that foundation.  We're here

12

1    because -- and again, relevance is undisputed here.  We're here

2    because this is a case about illegal stream-ripping and

3    copyright infringement.

4         The evidence we seek from the defendant will show the

5    source files that are being ripped, you know, the YouTube URLs,

6    the MP3 information, you know, the name of a song --

7         THE COURT:  Right.

8         MR. ZEBRAK:  -- that is being pulled out of that

9    video and that the user downloads, and the geographic location

10   of the downloader, all super key information for us to show the

11   direct infringement, the stream-ripping, the extent of the

12   infringement, including to, you know, conclusively rebut his

13   affirmative defense that the site's used for lawful purposes.

14   So --

15        THE COURT:  May I ask a question?  And perhaps I

16   don't think it's technically relevant to what your motion is,

17   but just for my edification, we've had other cases in this

18   court with various recording companies and so forth.  Don't you

19   also have a company that tracks this on your end, and that's

20   how you knew to begin with that he was having these essentially

21   illegal downloads?

22        MR. ZEBRAK:  Let me, let me address that.

23        THE COURT:  Okay.

24        MR. ZEBRAK:  So content companies, the --

25        THE COURT:  Right.

13

1          MR. ZEBRAK:  -- record industry included, monitor for

2   infringements.

3          THE COURT:  Right.

4          MR. ZEBRAK:  And certain types of infringements can

5   be detected; some can't.

6          THE COURT:  Okay.

7          MR. ZEBRAK:  So in the peer-to-peer world, where

8   Suzie Infringer and Johnny Infringer are on a network and you

9   see that they're on the network distributing information, I

10  don't necessarily see what goes on between Johnny and Suzie,

11  but I can see that Johnny's distributing music.

12          Here we, we can't necessarily see when I visit their

13  site what I'm doing and requesting the defendant site to rip

14  from YouTube.  That, that interaction happens between the end

15  user and the website --

16          THE COURT:  Okay.

17          MR. ZEBRAK:  -- and so that information then exists

18  on the website's server, but also the defendant pushes that

19  information out, so it exists in two places.

20          So the activity happens through the website, but then

21  the details of that transaction, again, URL source file --

22          THE COURT:  That's what you can't get, okay.

23          MR. ZEBRAK:  -- the music being ripped, and the

24  location of the downloader, that's in two different directions.

25          The underlying server --

14

1          THE COURT:  Right.

2          MR. ZEBRAK:  -- gets pushed out to the third-party

3  logging company.

4          Now, again, in this case, to answer Your Honor's --

5  you asked me what time that it was; I'm explaining how to build

6  a watch.  Getting back to the threshold question, declarations

7  and testimony are not needed from anybody because the defendant

8  can control his own server settings.  Again, he's, he's been

9  coy and has gone out of his way, he wouldn't speak with us

10  about what software he uses, though we think we've determined

11  it, and even in his declaration to the Court, he chose -- and

12  this is why Your Honor perhaps is a little bit confused -- he

13  chose to name his web hosting company, but he doesn't want to

14  name the web server software he's using.

15          THE COURT:  Okay.

16          MR. ZEBRAK:  And, and again, no dispute that he uses

17  Yandex.  We can observe it ourselves.  He hasn't disputed it,

18  and on top of that, we attached it to our reply brief, Your

19  Honor, his declaration where he talks about -- now, he doesn't

20  say, "I logged into my account," but he says, "Attached is a

21  report from Yandex."

22          Well, Yandex only has that information because he

23  pushes it out to them.

24          THE COURT:  I see.

25          MR. ZEBRAK:  And so what we want today, Your Honor,

1    and the reason we're here is that it's supercritical

2    information; it's relevant; he hasn't disputed it.  He hasn't

3    protested -- he hasn't, by the way, Your Honor, to answer your

4    question about third-party testimony, the defendant doesn't

5    dispute that he can do what we've asked, and he doesn't really

6    claim it's burdensome.

7         You know, he hasn't -- though his declaration talks

8    about it's my belief and understanding it could slow something

9    down or it may cost $4,500 for a year's worth of storage,

10   that's the extent to which they've protested burden.  They

11   don't argue burden in their, in their papers.

12        So really there's no question it's relevant.  There's

13   no question he has the data.  And really the, the argument

14   against burden is really flimsy here, and I'm prepared to

15   explain that in more detail.

16        So in a lot of ways, the core ground for our motion

17   is, is really undisputed, including the basis for the order,

18   for a preservation order.

19        THE COURT:  And do you think that the user agreement

20   that his customers have to agree to eliminates the concern

21   about the Russian privacy laws or German privacy laws?

22        MR. ZEBRAK:  Without question to my mind, Your Honor.

23        THE COURT:  Okay.

24        MR. ZEBRAK:  And this -- so let me, let me -- I think

25   our reply brief did a good job of addressing the concerns about

16

1   privacy that he raised, but they're, they're disingenuous to

2   begin with, and let me explain that.

3           So again, to begin with, he's already logging, right?

4   So he's saying, Your Honor, don't give the plaintiffs what they

5   want and need here.

6           Well, he's already engaging in that logging.  He's

7   pushing it out to his remote company, Yandex, right?  And he's

8   choosing, if he's to be believed, to tell the Court that he

9   doesn't engage in local logging on his underlying server.

10          We can't -- we don't have insight into that from the

11  outside looking in, but the point is he's already doing logging

12  remotely.  Even if he wasn't doing that, he's affirmatively

13  told his users -- and it's not just what's called a

14  browse-through, where it's posted somewhere.  He affirmatively

15  makes them click to say, "I agree."  So they've consented.

16          That deals with, you know, those privacy issues, and,

17  you know, we think that should be sufficient.  If we had to, we

18  could engage in some kind of redaction protocol or something,

19  but we don't think any of that's necessary, and the truth here,

20  Your Honor, is that he has this information two ways.

21          One of the problems is that he refuses to go to

22  his -- these analytics companies, to make it attractive for

23  people to sign up with them, they give their customers what's

24  called a dashboard, a fancy way for saying when you log in,

25  it's what you see.  And you can run reports.

1    The idea is when someone runs a report, you're

2    essentially saying:  Show me this information these ways --

3         THE COURT:  Right.

4         MR. ZEBRAK:  -- and maybe you can customize them, or

5    at a minimum, there's certain standard ones you can run, and

6    that draws up underlying data that's stored at the analytics

7    company at the request of, of the defendant.

8         So the point is he can do one of two things, but

9    ideally it should be both given our concerns about the

10   follow-through here.  He can, A, flip a switch, configure his

11   underlying web server software.  Web server software doesn't

12   require building anything, nothing like that.

13        THE COURT:  Right.

14        MR. ZEBRAK:  Flip a switch, log it.  As the logs are

15   built, you move them to a hard drive.  He doesn't have to store

16   them in a cloud for a few thousand a year, but even if it was a

17   few thousand a year, either he can bear that or alternatively

18   we could.  So that's easy.  Flip a switch.

19        The other thing he can do, he can go to his online

20   account at Yandex and run reports.  Now, that wasn't the thrust

21   of our motion because it's his account, not ours.  I haven't

22   worked with it.  I don't know exactly what it will look like

23   and how, you know, the length of time it's been preserved, so

24   we're kind of pursuing this information two different ways.

25        It's the same information, again, unquestionably

1    relevant, core central issues, no burden.

2              THE COURT:  Right.

3              MR. ZEBRAK:  He doesn't argue burden.  Privacy we

4    think we've dealt with.  Unquestionably ESI.  His argument that

5    it's not ESI just -- it is ESI.  It's information.  It's stored

6    long enough to be retrieved.

7              It's a similar standard for being permanent enough,

8    so to speak, for copyright infringement and being essentially

9    permanent enough to be ESI.  That's what courts have said when

10   they've looked at this.

11             This kind of data in what's called random access

12   memory is fixed enough for ESI and copyright, so the point is

13   he can -- that's why we didn't -- that's why we wanted him to

14   preserve it on the server level because right now he's not

15   preserving it.  If he's not logging, it means it's being when

16   he turns his computer off overwritten and disappears --

17             THE COURT:  Right.

18             MR. ZEBRAK:  -- except to the extent something's

19   being logged up at this remote server location.

20             So that's why we're here.

21             THE COURT:  I understand.

22             MR. ZEBRAK:  We just want this information.  We don't

23   need it for the next 20 years.

24             THE COURT:  Right.

25             MR. ZEBRAK:  We just need it to prove our case.

19

1          THE COURT:  All right, thank you.

2          MR. ZEBRAK:  Thank you, Your Honor.

3          THE COURT:  Do you have anything to add to your

4  opposition?

5          MR. GURVITS:  Yes.  Good morning, Your Honor.  First

6  off, just to, to make it easier for the Court, my brother is

7  absolutely right on most of his points.

8          THE COURT:  Good.  That's good.

9          MR. GURVITS:  He's right, he's right that -- I don't

10  disagree that the information that they'd like to see is

11  relevant except that they're looking for all information

12  worldwide, and 90 percent of what my client has has nothing to

13  do with the United States.

14          So they're not looking for just U.S.-based traffic

15  information.  They are looking for worldwide.  So we do dispute

16  that 90 percent of what they're asking for is relevant.  It's

17  not.

18          With respect to flipping a switch, yes, regardless of

19  what server software the defendant uses, I've been a computer

20  programmer for almost as long as I've been an attorney; I know

21  how this stuff works.  Yes, it's a matter of flipping a switch,

22  and then when that switch is flipped, information starts being

23  stored, but until that happens, it is not ESI.

24          THE COURT:  Then your client's declaration is wrong

25  when he says he has to basically rewrite the software.  It is

20

1    flipping a switch.

2              MR. GURVITS:  There are two aspects of what they

3    want.  One is traffic logs, and those are things like the IP

4    address of the user that is contacting the server.  So if I'm

5    here in, in this town and I use a computer, the computer has a

6    unique --

7              THE COURT:  I know that much.

8              MR. GURVITS:  Okay.

9              THE COURT:  Okay.

10             MR. GURVITS:  So that's -- that kind of logging a

11   server can do by flipping a switch.

12             THE COURT:  Yes.

13             MR. GURVITS:  With respect to the URL of the video,

14   that information comes from the user that types it into the

15   website.

16             THE COURT:  Yeah.

17             MR. GURVITS:  The website would have to be modified

18   to store a copy of that text, and that's the part that the

19   defendant says he would have to modify.  Now, yes, he'd have to

20   modify it.  There is some expense to it, but I'll concede for

21   the purposes at least of this hearing --

22             THE COURT:  Okay.

23             MR. GURVITS:  -- that it is not, you know, a huge

24   endeavor.

25             THE COURT:  Okay.  I appreciate that.

21

1          MR. GURVITS:  The issue here is whether just because

2  this information exists in random access memory, in RAM, the

3  Court should order a party to actually start storing it.  And

4  by analogy, this is what they're asking you to do:  If you are

5  familiar with Skype, you could be making a Skype phone call,

6  the video itself, all the information that's right there in

7  random access memory.

8          THE COURT:  So if it's easy to flip a switch or

9  change the, change the software slightly, which is not, you

10  admit, a big cost or a big deal to do, then why should I not

11  order that to be done?

12          MR. GURVITS:  Because then the Court is not asking a

13  party to preserve ESI information.  The Court is now

14  overstepping its boundaries by asking the party to create

15  information, and we've provided case law on point on that.  The

16  parties should not have the, the obligation to flip a switch to

17  record the Skype video call just because the information is

18  there.

19          THE COURT:  To put this in more antiquated terms,

20  because I don't think this happens as much anymore, although I

21  actually had a case recently where it does happen, it used to

22  be when storage was more of an issue that companies

23  auto-deleted e-mails.  For instance, after a certain date, they

24  had an auto-delete function on their, on their servers, and at

25  a certain point, you know, a year later, everything's gone.

22

1          Why is it not like that when -- to ask him to go in

2    and basically turn off the auto-delete to make the RAM a more

3    permanent memory?

4          MR. GURVITS:  This is exactly -- Your Honor is right

5    on point.  The example that Your Honor just stated is the

6    information is already stored on a hard drive --

7          THE COURT:  Right.

8          MR. GURVITS:  -- and then the protocol goes and

9    erases it.

10         This is different.  This information is not stored on

11   a hard drive.  It's in random access memory.  It's fleeting.

12   It's there for just a tiny, little moment.

13         THE COURT:  Right.

14         MR. GURVITS:  And just like the information during a

15   Skype video call is not stored on a hard drive, but it's easy

16   to flip a switch in Skype --

17         THE COURT:  Right.

18         MR. GURVITS:  -- and the video gets recorded.

19         THE COURT:  Right.

20         MR. GURVITS:  So they would have this Court

21   essentially make an order that could then be used to force a

22   party to start flipping -- to force a party to record every

23   single video call that they make --

24         THE COURT:  Yeah.

25         MR. GURVITS:  -- because the information happens to

23

1   be easy to record.

2           THE COURT:  Yes, I agree.  That's what I'd be

3   ordering, but it's not much different than telling them to

4   not -- to turn off the, do not -- the delete function.

5           MR. GURVITS:  We've provided case law that stands for

6   the proposition that it is very different to force a party not

7   to delete information that's already stored and essentially

8   issuing an injunction forcing a party to start creating ESI.

9           THE COURT:  Okay.

10          MR. GURVITS:  And this is, this is why we're not

11  disputing how easy it is.  We're disputing that what they're

12  asking the Court to do is order the defendant to start the

13  creation of ESI when none exists.  That is really where we

14  disagree.

15          My brother stated that this is already ESI.

16          THE COURT:  The ESI is there.  It's just in the RAM.

17  It's not in the permanent storage.

18          MR. GURVITS:  Under federal rules, ESI is only ESI if

19  it's permanently stored.  If it's in fleeting RAM, then it's

20  not.

21          THE COURT:  But it's not different -- I don't see how

22  it's fundamentally different from telling somebody to turn off

23  auto-delete.

24          MR. GURVITS:  Because the information is not

25  permanently stored at the time.

24

1          THE COURT:  I understand.

2          MR. GURVITS:  That's, that's the key difference.

3          THE COURT:  Okay.  All right, thank you very much.

4          MR. GURVITS:  Yes.

5          THE COURT:  All right, I'm convinced now that, that

6     the defendant -- the plaintiffs' motion is appropriate.  The

7     defendant has conceded that they can easily reconfigure the

8     software, turn on or off a switch to capture both the IP

9     addresses and the URL video information and the other details

10    that the plaintiff requests, and although I understand that

11    this may be a novel issue, I really don't think it's that

12    complicated, because to me -- and I, and I admit that I have a,

13    you know, a, you know, more simplistic view of, of how this all

14    works than perhaps you-all do, but we used to regularly and

15    still do regularly tell parties to not delete, to not

16    auto-delete, and if they have to go in and flip a switch to do

17    that, they have to go in and flip a switch to do that.

18          And it's, yes, creating information, storing

19    information that otherwise would not be stored, but that's

20    essentially what I'm telling the defendant to do here is to

21    turn off or to turn on, rather than turning off auto-delete,

22    they're turning on the preservation of this data in long-term

23    storage rather than our RAM.  So that's a simple difference to

24    me.

25          MR. GURVITS:  Your Honor, just for clarification, is

1  Your Honor's order only for U.S.-based traffic or for worldwide

2  traffic?

3          THE COURT:  Is there an ability to differentiate?  I

4  doubt there is.

5          MR. GURVITS:  Yeah, of course there is.  That's the

6  whole point of Yandex.  We see where the IP addresses are

7  coming --

8          THE COURT:  You can differentiate between worldwide

9  and U.S. traffic?

10          MR. GURVITS:  Sure, and that was, that was --

11          THE COURT:  But how is the plaintiff going to know

12  that you're actually recording all of the U.S. data?

13          MR. GURVITS:  Because U.S. data is coming from IP

14  addresses that are allocated to the United States.  That's how

15  geolocation works.

16          THE COURT:  All right, let me hear from the plaintiff

17  on that.  I'm not sure how, how you're going to know that he's

18  not only producing -- that he's producing all of it rather than

19  a tenth of it.

20          MR. ZEBRAK:  A substantial concern.

21          THE COURT:  Right.  So I'm going to order that he

22  produce all of it.  I don't think the Russian privacy

23  agreements or the German privacy agreements are at issue here

24  because they've waived, and there's a court order here that he

25  produce it, so --

26

1          MR. ZEBRAK:  Your Honor, the other thing, just --

2          THE COURT:  Sure.

3          MR. ZEBRAK:  -- well, actually two points.

4          Just so there's no confusion in the later transcript

5    from today, Your Honor mentioned that you were ordering the

6    defendant to preserve data, but I think Your Honor at one point

7    mentioned --

8          THE COURT:  I understand he's actually creating --

9    you're saying what -- I'm sorry, what are you saying?

10          MR. ZEBRAK:  I think Your Honor corrected herself

11    when she started saying, "I'm going to order you to create

12    data," but then you said "preserved."

13          THE COURT:  Well, it's to record it in a more

14    permanent fashion, okay?

15          MR. ZEBRAK:  That --

16          THE COURT:  He's not actually creating data.  The

17    data is there in the RAM memory.

18          MR. ZEBRAK:  Thank you, Your Honor.  I just --

19          THE COURT:  He has to preserve it in a longer-term

20    storage -- computer storage.

21          And it sounds to me as though the cost here is de

22    minimis.  $4,500 or even more than that, frankly, is nothing

23    compared to what we're talking about in terms of the legal

24    costs, in terms of the damages here.  If it is excessive, later

25    I can revisit that, but right now I don't think that there

1   should be any issue with the defendant bearing that at this

2   point.

3          So he is not in my mind creating it.  He is

4   preserving something that's already there in the RAM memory.

5   He's just going to have to preserve it in a longer-term storage

6   fashion.

7          Am I wrong in saying it that way?  I don't see how I

8   am.

9          MR. ZEBRAK:  Your Honor sounds like a technologist

10  now.

11         THE COURT:  Okay.  Well, maybe I'm not as dumb as I

12  let on, but I do get confused about it.  So at any rate, I am

13  going to grant the plaintiffs' motion in full.

14         I did want to ask why the defendant has not complied

15  with my prior order.

16         MR. GURVITS:  Your Honor, I don't have an answer

17  other than I am as frustrated because this is a winnable case

18  for the defense, and all he has to do is comply.

19         THE COURT:  Well, I think that your client's -- you

20  know, this whole issue about producing this data, you know, I'm

21  not sure we're going to get him to do that either, even though

22  I've produced -- I've ordered it today, and I hope your client

23  understands, I'm sure you've explained it to him, that if he

24  doesn't comply with my orders, pretty soon he's going to be in

25  a position where he has no defense to this case.  They're going

28

1  to get this by default or almost default judgment, and then

2  it's just a matter of damages, and he's going to be in a world

3  of trouble in terms of having any ability to defend this case.

4         MR. GURVITS:  Your Honor, this is -- in 20 years of

5  practice, this is the first time I'm faced with this situation.

6  I can assure the Court the defendant understands --

7         THE COURT:  Okay.  I'm sure you've told him.

8         MR. GURVITS:  -- the consequences of his behavior.

9         THE COURT:  Okay.  Thank you.

10        Anything else?

11        MR. ZEBRAK:  Yes, Your Honor.  Two, two quick

12  follow-ups.  The first is with respect to today's order, I

13  think it would benefit the sort of orderly progress of the next

14  steps here if some sort of schedule were established.

15        THE COURT:  Normally under our local rules, it's ten

16  days.  So I know he'd have to go in and start recording and

17  then produce the --

18        MR. ZEBRAK:  Right.

19        THE COURT:  -- or capture the information and then

20  start producing.

21        So he'd have to comply with my order and start in

22  terms of preservation of data within ten days.  Then your

23  discovery schedule is --

24        MR. ZEBRAK:  I believe it's August -- I believe it's

25  the 13th is, is the cutoff for fact discovery, and --

29

```
1           THE COURT:  So he -- I mean, you're not going to be

2   able to preserve much data here --

3           MR. ZEBRAK:  No.

4           THE COURT:  -- but I guess that would give you

5   something to extrapolate from.

6           MR. ZEBRAK:  Yes, Your Honor.  What I was going to

7   suggest, with the Court's indulgence, is, well, first of all, I

8   would hope now that the landscape is fully clear that the

9   defendant go about doing two things.  One is produce the

10  information available to him from his Yandex account and run

11  the reports, not create the data.

12          THE COURT:  Okay.

13          MR. ZEBRAK:  The second is flip the switch on his

14  underlying web server software, and I would -- so that he

15  begins storing it.  I mean, whether he does it today, tomorrow,

16  or the next day, I suppose that that's less important than

17  that, that he do it and begin preserving it and --

18          THE COURT:  So the Yandex report he can run

19  without -- he can just run it.

20          MR. ZEBRAK:  Yeah.  That, that would be like you

21  logging into your online banking account.

22          THE COURT:  Okay.

23          MR. ZEBRAK:  Yeah.

24          THE COURT:  All right.  So I'm going to order that he

25  start preserving the data by the 2nd, that's a week from today,
```

1   and that he produce the Yandex reports by a week from Friday --

2   well, make it Tuesday because that's a holiday, the 6th of

3   July.  That gives him essentially 11 days to produce that.

4          And then he'd have to produce whatever he's recording

5   that he begins storing within 30 days after he -- so it would

6   be by -- if he starts recording on July 2, he'd have to

7   produce, say, a 30-day report by August 6.

8          MR. ZEBRAK:  What, what I would ask, Your Honor, is

9   that -- you know, in life, we kind of think of 30-day cycles.

10          THE COURT:  Right.

11          MR. ZEBRAK:  Renting month to month, that sort of

12   thing, but with an underlying log like this, what we would

13   actually -- if, if he doesn't begin preserving until the 2nd

14   and then waits another 30 days, what we -- we're then hamstrung

15   in our ability to use it and have our expert --

16          THE COURT:  Okay.  How would you suggest that he

17   produce it?

18          MR. ZEBRAK:  So what I'd actually ask for is that he

19   at least produce the first week's worth.

20          THE COURT:  Okay.

21          MR. ZEBRAK:  And then we can work something out

22   thereafter if there's an issue with the logistics.

23          THE COURT:  Okay.  So he'd start recording by July 2

24   and producing every week by July 9.

25          MR. ZEBRAK:  That would be terrific.

31

```
1              THE COURT:  Okay?

2              MR. ZEBRAK:  Thank you, Your Honor.

3              And the other item, kind of minuscule, but I just

4   didn't want to have an issue later, with respect to the first

5   order that, that the defendant hasn't complied with yet, one of

6   the -- one of the issues was to produce in unredacted format

7   documents that he produced in redacted format.

8              THE COURT:  Right.

9              MR. ZEBRAK:  We've observed that some of the

10  redactions were, were done in kind of an imprecise way, where

11  we could look at the information ourselves, and in the normal

12  course of things, when we know a party has intended to, you

13  know, inadvertently produced something or redacted something,

14  we wouldn't look at it, but given that Your Honor's ordered it

15  unredacted, I just wanted to confirm that it would be okay with

16  the Court --

17             THE COURT:  Yes.

18             MR. ZEBRAK:  -- for us to, yeah, remove the redaction

19  ourself if we can.

20             THE COURT:  Sure.

21             MR. ZEBRAK:  Okay.  Thank you, Your Honor.  And just

22  to be clear, that's not the case for all the redactions.  It

23  may be that in some of the instances, we can, and we just

24  didn't want to have an issue later.  So thank you.

25             THE COURT:  I don't think that that is an issue.
```

32

1          MR. ZEBRAK:  Okay.  Thank you, Your Honor.  We

2   appreciate the Court's time today.

3          THE COURT:  All right, thank you.

4          All right, Court stands in recess.

5                         (Which were all the proceedings

6                          had at this time.)

7

8                CERTIFICATE OF THE TRANSCRIBER

9      I certify that the foregoing is a correct transcript from

10  the official electronic sound recording of the proceedings in

11  the above-entitled matter.

12

13                    _____
                              /s/
14                       Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25