# Exhibit 3



Neutral Citation Number: [2021] EWHC 410 (Ch)

Case No: IL-2020-000223

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**INTELLECTUAL PROPERTY LIST**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 25/02/2021

Before :
**MR JUSTICE MILES**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**(1) YOUNG TURKS RECORDINGS LIMITED**
**(2) XL RECORDINGS LIMITED**
**(3) WARNER MUSIC UK LIMITED**
**(4) WARNER BROS. RECORDS, INC.**
**(5) SONY MUSIC ENTERTAINMENT UK LIMITED**
**(6) SIMCO LIMITED**
**(7) QUEENS LITE, INC**
**(8) MATADOR RECORDS LIMITED**
**(9) DOMINO RECORDING COMPANY LIMITED**
**(10) CAPITOL RECORDS, A DIVISION OF UNIVERSAL OPERATIONS LIMITED**
(suing on their own behalf and in a representative capacity on behalf of members of BPI (British Recorded Music Industry) Limited and of Phonographic Performance Limited)

**Claimants**

- and –

**(1) BRITISH TELECOMMUNICATIONS PLC**
**(2) EE LIMITED**
**(3) PLUSNET PLC**
**(4) SKY UK LIMITED**
**(5) TALKTALK TELECOM LIMITED**
**(6) VIRGIN MEDIA LIMITED**

**Defendants**

- - - - - - - - - - - - - - - - - - - - -

**Edmund Cullen QC** & **Gwilym Harbottle** (instructed by **Lee & Thompson LLP**)
for the **Claimants**

The **Defendants** did not appear and were not represented

Hearing dates: 3 February 2021

- - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**Covid-19 Protocol**: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 10:30 on 25 February 2021.

**Mr Justice Miles:**

1. The Claimants are record companies suing for themselves and in a representative capacity on behalf of other record company members ("Members") of BPI (British Recorded Music Industry) Limited ("BPI") and Phonographic Performance Limited ("PPL"). BPI is co-ordinating these proceedings on behalf of the Claimants. BPI is itself a member of the International Federation of the Phonographic Industry ("IFPI"), an international record industry body.

2. The Claimants seek an order pursuant to section 97A of the Copyright, Designs and Patents Act 1988 ("the Act") and s.37 Senior Courts Act 1981 against the Defendant internet access providers (sometimes known as internet service providers or "ISPs"), requiring them to take measures to block their subscribers' access to certain websites ("the Infringing Sites" or "the Sites"). The Claimants submit that the operators of the Infringing Sites are directly infringing and/or jointly and severally liable for the infringement of copyrights owned by/exclusively licensed to Members. The Claimants also submit that the infringement they allege involves wholesale circumvention of technological protection measures ("TPMs").

3. The Infringing Sites were identified in the claim form as: (1) Flvto.biz ("Flvto"); (2) Flv2mp3.by ("Flv2mp3"); (3) Flvtool.com ("Flvtool"); (4) 2Conv.com ("2Conv"); (5) 2Convert.net ("2Convert"); (6) H2Converter.com ("H2Converter.com"); (7) H2Download.org ("H2Download"); and (8) Ytbapi.com ("Ytbapi"). Since the claim form was issued, there have been a number of changes, some of which will require an amendment to the Claim Form:

    i) Flvtool, 2Convert, H2Download and Ytbapi have ceased to be used since the issue of the Claim Form. However the evidence shows it would be possible for these four sites to be reactivated. Accordingly the Claimants wish to retain these sites in the list of Infringing Sites. The fact that these four sites are not

                presently in use has had no material effect on the functionality of the other Infringing Sites.

       ii)      H2Converter.com now redirects to an Infringing Site called H2Converter.net ("H2Converter.net") where the service previously on H2Converter.com can be found. References to "H2Converter" below are to H2Converter.com or H2Converter.net as applicable. I grant permission to add H2Converter.net to the list of Infringing Sites in the claim form.

      iii)     A number of the existing Infringing Sites are connected to a new site called MP3.Studio ("MP3Studio"). I grant permission to add this too to the list of Infringing Sites.

4.    The Claimants submit that all of the Infringing Sites have participated in and/or have enabled a process called "stream ripping", i.e. the "ripping" of audio files used with music videos that are offered on streaming services, in particular YouTube. Stream ripping is a process whereby streamed audio content is converted into permanent audio downloads which can be stored for future consumption and/or shared with others. The Claimants' evidence explains that this is one of the fastest growing forms of online infringement of copyright in sound recordings and the most prevalent.

5.    Arnold J helpfully set out the legal framework for website blocking orders in *Dramatico Entertainment Ltd v British Sky Broadcasting* [2012] EWHC 268 (Ch) ("*Dramatico*") at [30]-[38]. That jurisdiction has been further explained and developed in *EMI Records Ltd v British Sky Broadcasting Ltd* [2013] EWHC 379 (Ch); *The Football Association Premier League Limited v British Sky Broadcasting* [2013] EWHC 2058 (Ch); *Paramount Home Entertainment International Limited v British Sky Broadcasting* [2013] EWHC 3479 (Ch) ("*Paramount*"); *1967 Ltd v British Sky Broadcasting* [2014] EWHC 3444 (Ch) ("*1967 Ltd*"); *Twentieth Century Fox Film Corp v Sky UK Ltd* [2015] EWHC 1082 (Ch) ("*Popcorn Time*"); *Football Association Premier League Limited v British Telecommunications Plc* [2017] EWHC 480 (Ch); *Nintendo Co Ltd v Sky UK Ltd* [2019] EWHC 2376 (Ch) ("*Nintendo*"); and *Matchroom Boxing Ltd v BT Plc* [2020] EWHC 2868 (Ch) ("*Matchroom*").

6.    The Claimants contend that the Court has jurisdiction in the present case because (i) each of the Defendants is a service provider within the meaning of section 97A of the Act (or so far as the TPMs are concerned, an intermediary within the meaning of Art. 11 of the Enforcement Directive); (ii) the users and/or operators of each of the Infringing Sites infringe the Claimants' and the Members' copyrights and rights in respect of TPMs; (iii) the users and/or operators of each of the Infringing Sites use the Defendants' services to do so; and (iv) the Defendants have actual knowledge of this. The Claimants further submit that it is just and proportionate for the Court to make the order sought in respect of each Infringing Site.

7.    The claim was issued and served on the Defendants with the evidence on 21 December 2018. Supplemental evidence bringing the factual position up to date has been served for this application. The Claimants explain the delay as follows. Site-blocking orders are complex and while the Defendants will not usually consent to their being made, they are usually prepared to agree the terms of an order which they will not then oppose, leaving the decision as to whether to make an order to the Court. Since December 2018 there have been long-running open and without prejudice

      negotiations with the Defendants about the form of the Order. On the day of the hearing before me the ISPs confirmed that they had agreed the form of the order with the Claimants. They did not oppose the order in principle.

8. It appears from the researches of the Claimants and their counsel that this is the first application for a blocking order in respect of stream ripping sites. In light of the comments of Birss J in *Popcorn Time* at [5]-[15], I decided that there should be a hearing rather than dealing with the application on paper.

**The evidence and factual background**

9. I have considered and relied on the witness statements (with exhibits) of (a) Mr Kiaron Whitehead, General Counsel of BPI. He is responsible for the overall co-ordination of the proceedings on behalf of the Claimants; and (b) Mr Michael Walsh. He is an IT specialist who acts as a consultant for the BPI. He has acted for the BPI in an expert capacity in a number of previous applications pursuant to s.97A. His original evidence relates to the period of Autumn 2018. He has subsequently reviewed that evidence on various occasions culminating in checks in December 2020.

10. In this section I summarise the Claimants' evidence. I have drawn heavily on the Claimants' helpful skeleton argument (having satisfied myself that it faithfully reflects the underlying evidence).

*The Claimants' copyright works*

11. Each of the Claimants is in the business of making, owning and exploiting sound recordings of musical compositions. For the purposes of these proceedings, particular recordings have been selected as sample works (the "Claimants' Recordings").

12. Mr Walsh explains that in late 2018 all of the Claimants' Recordings were ripped and downloaded from each of the Flvto, 2Conv and H2Converter sites and (independently) using a downloadable application ("the Downloader App" - an application offered for download onto users' computers, phones or other devices: see further below).

13. In late 2019 Mr Walsh reviewed the Infringing Sites and in the process converted and downloaded one of the Claimants' Recordings from each of Flvto, 2Conv, Flv2mp3, and H2Converter. He also downloaded five of the Claimants' Recordings using the Downloader App.

14. In September 2020 Mr Walsh downloaded three of the Claimants' Recordings using the Downloader App. In November 2020 he downloaded: each of the Claimants' Recordings from each of Flvto, 2Conv and Flv2mp3; all but one of the Claimants' Recordings using the Downloader App; and one of the recordings from H2Converter. In September 2020 the BPI Content Protection Unit converted and downloaded five of the Claimants' Recordings from H2Converter, and in November 2020 downloaded four of the Claimants' Recordings from H2Converter.

15. Each of the Claimants either owns or is the exclusive licensee of the UK copyright in the relevant Claimants' Recording. Where a Claimant is an exclusive licensee the copyright owner is also a Claimant.

16. None of the Claimants has granted a relevant licence to any of the operators of the Infringing Sites or their users.

17. The Claimants' Recordings represent a small fraction of the sound recording and film copyrights controlled by the Claimants and the Members on whose behalf the proceedings are brought. The Members together hold the UK rights for approximately 99% of all sound recordings legally consumed in the UK. No Member has granted a licence to any of the operators of the Infringing Sites.

18. In addition, the Claimants and Members have rights in the videos which are being stream ripped as described below and have not consented to their being ripped in this way. The Claimants have not authorised the ripping of videos from YouTube or of sound recordings from other platforms such as Facebook or Tik Tok.

**The process of "stream ripping"**

19. Streaming content is different from permanently downloading it. Streaming involves the contemporaneous digital transmission of content via the internet to the user's device for real-time viewing or listening. No permanent download is made and if the user wishes to access the content again he or she has to stream it again. Permanent downloading results in the user having a digital version of the content which (once the download is complete) can be used as often as the user wants and (subject to copyright protection measures) shared with others.

20. There are different business models and pricing systems for streaming and downloading. Streaming is normally funded by advertising or user subscription. A permanent download is a one-off transaction.

21. To protect the value of their services and the content they make available, providers of licensed streaming services impose contractual terms and TPMs aimed at preventing content from being downloaded.

22. Stream ripping sites enable such TPMs to be bypassed and provide users with TPM-free permanent downloads.

23. The primary target of stream rippers is YouTube, which is the most prominent online video hosting platform. YouTube delivers video and audio content from its website or its YouTube app by a process called "progressive downloading", whereby the content is retrieved ahead of the current point in play.

24. YouTube offers a standard and a premium service. When the user is using the standard service, once the whole video and audio has been played, it is temporarily stored on the user's device and can be replayed for a limited time (an hour or two). The stored content is discarded when the browser tab or app is closed and cannot be retrieved later. The standard service does not permit users to download or save videos for offline use or to extract the audio stream from the video footage.

25. YouTube's premium service (which costs £11.99 per month) provides advertising-free streaming. In addition, users who have downloaded the YouTube app can download and watch videos for 30 days, which period can be extended if the user connects online during that 30 day period. The content can only be accessed through

        the YouTube app. If the subscription is cancelled the user no longer has access to the downloads.

26.    When a user wishes to play a video on YouTube, the starting point is to access the "Watch Page" for the video. The Watch Page can be accessed either directly (by typing or copying and pasting the relevant URL) or by using the YouTube search facility. Once the Watch Page has been accessed by the user's device, the YouTube server delivers a piece of software called the YouTube Player to the user's device. The YouTube Player then locates the relevant media streams from the Google media server (YouTube is owned by Google LLC). There are separate audio and video streams. The audio streams are not in MP3 format (which is the format in which stream rippers deliver the content to the user).

27.    As just explained, the audio and video streams derive from the Google media server where they are identified by URLs. If the identity of the URLs was readily ascertainable by the user it would be possible for the user to download the content. Accordingly, the identity of the URL which is delivered to the YouTube Player on the user's computer is encrypted using a "rolling" cipher (i.e. an encryption algorithm which is updated many times per week). The YouTube Player includes a decryption tool (or key) to decrypt the encrypted URL. The tool is updated to match the cipher. The YouTube Player decrypts the encrypted URL and is thus able to identify the correct URL from which to retrieve the content.

28.    The cipher and key routine amounts to a "technological measure" within s.296ZF(1) of the Act (implementing Art. 6(3) of the Information Society Directive) because it is a technology, device or component designed in the normal course of its operation to protect a copyright work other than a computer program: here, the sound recordings made available on YouTube. The use of the work is controlled by "an access control or protection process such as encryption, scrambling or other transformation of the work" (s.296ZF(2)). YouTube implements the process in the course of making works (including the Claimants' works) available on behalf of their copyright owners. Accordingly, the cipher and key routine is operated by YouTube as agent for, licensee of or in conjunction with the copyright owner such that the cipher and key routine is an "effective" technological measure within the meaning of s. 296ZF(2) (called a "TPM" in this judgment).

29.    Google has recently (and after the issue of these proceedings) implemented further measures to assist rights owners in protecting their rights.  It has implemented a more sophisticated search engine de-listing service in recognition of the fact that stream rippers have violated YouTube's TPMs.

**The stream ripping process on the Infringing Sites and via the Downloader App**

30.    Mr Walsh describes the stream ripping process on the Infringing Sites and Downloader App in his first statement.  He has confirmed in his second statement that the position has not materially changed since his original investigation in November and December 2018.

31.    The process works like this. From the user's point of view all that is required is to copy the Watch URL for the video in question into a text box on the Infringing Site or the Downloader App, click on a button labelled "Convert" or something similar, wait

a short time while the file is "converted" (or retrieved from cached content), click on a "Download" button" and save the file to the user's computer.

32. Where this operation takes place via an Infringing Site, the technical processing involved in the conversion of the streamed content takes place on the server of the stream ripping site operator and the downloadable file is delivered to the user from that server or from another server under the control of the operator of the stream ripper service.

33. Or the ripping can be done using the Downloader App (all versions of which are currently the same and are branded "MP3Studio"). Once downloaded, the Downloader App is stored on the user's computer or device and enables the user to select a video and rip the audio without accessing the Flvto, Flv2mp3.com, 2Conv or MP3Studio sites. Other facilities provided by the Downloader App are the management of a library of ripped content and the ability to play the audio files directly.

34. When using the Downloader App, conversion from the YouTube stream occurs on the user's computer and involves the decryption of the encrypted URL, thus circumventing YouTube's TPMs.

**The operation of the Infringing Sites and the Downloader App**

35. The evidence establishes that each of the Infringing Sites has been involved in the provision of stream-ripping functionality. The present activities of the active sites can be summarised as follows:

    i) Flvto, Flv2mp3, 2Conv and H2Converter each provide a stream ripping service to visitors to the site.

    ii) MP3Studio provides the Downloader App. Flvto, Flv2mp3 and 2Conv (which are closely connected) also make the Downloader App available by linking to MP3Studio. MP3Studio does not provide a stream ripping service to visitors to the site.

36. As I mentioned in [3(i)] above, there are four other sites which do not appear to be operating at the moment. Flvtool was used by other Infringing Sites as a "back end" server and provided the Downloader App. 2Convert provided the Downloader App. H2Download and Ytbapi operated as back end domains for H2Converter, assisting in the conversion process and storing ripped content.

37. There are thus some differences in the functionality of the Infringing Sites. However each site:

    i) provides a stream ripping service by a simple and convenient user interface which enables users to obtain downloads ripped from YouTube (and other platforms); and/or

    ii) provides or promotes the Downloader App; or

    iii) provides back-end facilities to assist in the operation of the Infringing Sites and the Downloader App.

38.  The Infringing Sites operate for profit. Flvto, Flv2mp3, 2Conv and H2Converter carry advertising. Based on the visitor figures for the period September 2017 and August 2018 Mr Walsh estimated annual worldwide revenue for Flvto and 2Conv at between US$2.5 and US$11m and annual UK revenue at between US$460,000 and US$2.03m. Given the updated usage figures (and the introduction of a payment system for use of the Downloader App) it is reasonable to infer that significant UK revenues are likely to be continuing. Mr Walsh estimated annual worldwide revenue for H2Converter at up to US$35,000 and annual UK revenue up to US$9,400. MP3Studio does not carry advertising but payment is taken for "conversions" using the Downloader App (over and above three free "conversions").

**Terms of use**

39.  The sites include terms of use which purport to make users responsible for material they download through the site, a purported prohibition on infringing copyright and a purported DMCA (Digital Millennium Copyright Act) Notice. However the Claimants submit (and I am satisfied) that this is window dressing. The whole purpose of the technology offered by the Infringing Sites is to circumvent the TPMs on streaming sites like YouTube. The TPMs are designed to protect copyright. It is an overwhelming inference that (despite these terms of use) the site operators know that the users are using their services to infringe copyright.

**The Operators**

40.  Mr Walsh has analysed the connections between Flvto, Flv2mp3, 2Conv and MP3Studio. The registrant of the principal domain of each site is presently hidden behind a privacy shield. The purported provider of the services on each site has regularly changed and includes Mr Tofig Kurbanov, what purports to be a Russian LLC called Perspektiva LLC and a Cyprus company called Able Sun LTD. A Russian operator called Hotger links to Flvto and the Downloader App and its name appears on the Downloader App. But the nature of the connection with Hotger is unclear.

41.  In December 2019 Mr Walsh downloaded the Downloader App from Flvto. The publisher was stated to be "Able Sun Holdings Limited" whose directors are also directors of some 135 and 17 other companies respectively. This company's name also appeared on a consent form when was payment made (in GBP) to obtain more than three downloads. However, on the credit card statement the beneficiary was stated to be "paddle.net flyto" (Paddle is a London-based credit card payment operator). When the Downloader App was downloaded it created registry entries referring to Hotger and FlvtoConverter. Documentation on the site has referred to Mr Kurbanov, a Mr Otstavnov and to the company called "Able Sun LTD".

42.  The ownership and control of H2Converter is again obscure. In December 2018 the registrant of H2Converter.com was one Cherry Pham whose address was stated to be "LA, LOS ANGELES, UNITED STATES, VIETNAM [*sic*]". However, the telephone number's prefix suggested that it was a Mexico number while the H2Converter Twitter account had Thailand as its stated location. Attempts to correspond with the controllers of the site have been fruitless. The registrant details for H2converter.net are hidden behind a privacy shield.

43. Mr Whitehead has explained how IFPI has in the past written to Flv2mp3 and that there have been various attempts made in a number of jurisdictions to take action to stop one or more of the Infringing Sites from infringing copyright. In particular, US record companies brought proceedings against Mr Kurbanov and others in Virginia USA in respect of infringement by means of Flvto and 2Conv. The proceedings are ongoing. In a declaration dated 1 October 2018 in support of a motion to dismiss for want of jurisdiction (or transfer the claim to California) Mr Kurbanov asserted that he operated Flvto and 2Conv and lived in Rostov-on-Don in Russia where substantially all the work he had done on Flvto and 2Conv had been carried out.

44. In those proceedings Mr Kurbanov has asserted that there might be legitimate reasons for the use of the Infringing Sites. According to Mr Kurbanov, professors and students might choose to download audio portions of lectures for later reference and playback; bands may want to capture the audio tracks from live performances captured on video; and parents may want the audio portion of a school concert that they recorded. This is more theoretical than real. Mr Kurbanov provides no evidence that this ever happens. In any event, all the examples he gives involve uploaders who are highly likely to have retained local copies of their videos. Even if they have not retained local copies, uploaders are permitted by YouTube to download any videos they have uploaded.

45. Moreover, music videos constitute 94 of the top 100 most-viewed YouTube videos and in December 2019, 9 out of 10 of the most popular videos on YouTube were music videos. There is no reason to suppose that such figures are not mirrored on the stream ripping sites, which aim to maximise advertising revenue. I also note that the Order sought on this application gives users liberty to apply.

**Are the Defendants service providers within the meaning of s. 97A?**

46. The Defendants are service providers within the meaning of regulation 2 of the Electronic Commerce (EC Directive) Regulation 2002 (SI 2002/2013) and hence within the meaning of section 97A of the Act: *Dramatico v Sky (No 2)*, *EMI v Sky*. The Defendants have not suggested otherwise. I am also satisfied that the Defendants are intermediaries within Art. 11 of the Enforcement Directive: see per Arnold J pointed out in *Nintendo v Sky* at [40(i)].

47. The Defendants are the six largest ISPs in the UK, which between them share approximately 91% of the fixed line broadband market. The Claimants have not joined the ISPs making up the remaining 9% of the fixed broadband market in the interests of proportionality.

**Infringement of copyright**

48. The Claimants contend that there have been infringements: (i) by users of the Infringing Sites and/or the Downloader App, in committing acts of copying within s.17 of the Act; (ii) by the operators of the Infringing Sites, in authorising users' infringements within s. 16(2) of the Act; (iii) by the operators, as joint tortfeasors with the users; and (iv) by the operators, in communicating works to the public within s. 20 of the Act. These acts of infringement are considered below.

*Infringement by users: copying*

49. The Claimants' case is simple and straightforward. When a user of an Infringing Site or the Downloader App clicks on a link or on a button in the Downloader App in order to obtain a copy of particular content, and downloads the linked content files from YouTube, the user copies the content contained in those files onto his or her computer. Where the content files comprise a copyright work and the user does not have the licence of the copyright owner, he or she infringes copyright.

50. I am satisfied by the evidence that this case is made out to the civil standard: there is persuasive evidence that UK users use the operative Infringing Sites and the Downloader App to download and make copies of the Claimants' Recordings and other recordings in which copyright is owned by or exclusively licensed to the Claimants or the Members. In this regard, the evidence shows that: the Infringing Sites have a large number of UK users and the Infringing Sites are able to "convert" all recordings on YouTube which includes Members' copyright content. This has been specifically confirmed by downloading the Claimants' Recordings.

51. Since these acts of copying (and the other acts identified below) took place without the licence of the Claimants or the Members, they constituted infringements of copyright. There is no defence of personal use.

**Infringement by operators: authorisation of users' infringement**

52. The Claimants rely on s.16 of the Act which says that copyright in a work is infringed by a person who without the licence of the copyright owner authorises another to do any of the acts restricted by the copyright.

53. In *Twentieth Century Fox v Newzbin* [2010] EWCH 608 (Ch) Kitchin J explained in [90] that to authorise means the grant or purported grant of the right to do the act complained of and does not extend to merely enabling, assisting or even encouraging the act. He went on to say this:

> "…The grant or purported grant to do the relevant act may be express or implied from all the relevant circumstances. In a case which involves an allegation of authorisation by supply, these circumstances may include the nature of the relationship between the alleged authoriser and the primary infringer, whether the equipment or other material supplied constitutes the means used to infringe, whether it is inevitable it will be used to infringe, the degree of control which the supplier retains and whether he has taken any steps to prevent infringement. These are matters to be taken into account and may or may not be determinative depending upon all the other circumstances".

54. I shall consider these various features under a number of headings.

55. First, the nature of the relationship. The Claimants point out that the Infringing Sites provide "conversion", links to sites providing the Downloader App, and downloads of the Downloader App itself and that these each provide a sophisticated and user-friendly environment in which their users are able to locate downloads with ease. Flvto also provides facilities for sharing links with other users and saving downloaded files to Dropbox. The Downloader App provides a convenient means of storing and retrieving downloaded content. Flvto and H2Converter each have a special feature which makes the conversion process particularly easy.

56. I am satisfied to the civil standard that the reason these Sites and the Downloader App exist and are operated in this way is to enable users to obtain copyright works illegally. The reason they provide "conversion" is to enable users to obtain permanent downloaded content from streaming services which have safeguards to prevent just that happening.

57. Second is the means used to infringe. The Infringing Sites constitute a means of enabling users to infringe copyrights. YouTube deliberately prevents downloading of content; the conversion technology provided by the Sites provides a means of getting around these safeguards.

58. Third, there is the probability or inevitability of infringement. I am satisfied that infringement is the inevitable consequence of the service provided by the operative Infringing Sites: "conversion" itself; links to sites providing the Downloader App; and downloads of the Downloader App. The whole point of these services is to make available unlicensed music downloads (or the means to do so) and it is effectively inevitable that these services will be used to download copyright material including commercially successful recordings.

59. Fourth, the commercial purpose of each operative Infringing Site is to generate revenue. In the case of each Infringing Site, revenue is generated through advertising, which all of them feature to a greater or lesser extent, by attracting users to the website with the free means of copying and making available popular content. In the case of the Downloader App, revenue is generated through payments made by users who wish to make more than three conversions.

60. As already explained, there is no real attempt by the Infringing Sites to avoid copyright infringements. I have already said why I am satisfied that the terms of use (which purport to prohibit infringing copyright) are window dressing. I consider that is unreal to suppose that the operators of the sites are seeking to prevent copyright infringement.

61. The Sites do purport to offer a takedown facility (requiring rights holders to identify specific links for removal of infringing content). The provision of such facilities demonstrates the operators' awareness of the use of the Infringing Sites for copyright infringement. The evidence shows that these facilities are wholly inadequate (see more about this below).

62. There are also serious difficulties in identifying the websites' operators (explained above). The steps taken by the Infringing Sites' operators to conceal their identity suggest an awareness of their inevitably infringing activities and a desire to evade action and enforcement against them.

63. Fifth, there is the operators' degree of control. I am fully satisfied that each of the operators of the Infringing Sites that provide "conversion", or the Downloader App has the capacity to prevent further downloads.

64. Sixth, there are the steps to prevent infringement. I am satisfied that the operators have not taken genuine steps to prevent infringement. The purported takedown facilities are worthless. Specifically, there is no readily available relevant content hosted on the sites. The sites do use URLs but there is no way for the Claimants or

        Members to know in advance that particular content will be ripped or downloaded. In any event the URLs relate to YouTube's servers, not pages on the Sites.

65. I am satisfied in the light of these various factors that the Infringing Sites have authorised infringing copying of the Claimants' copyright material.

66. Counsel for the Claimants properly raised the possible significance of the *Popcorn Time* decision in relation to the Downloader App. The applications considered by Birss J in that case were in some respects analogous to the Downloader App. They enabled users to obtain unlicensed film and TV content. The "PTAS" sites supplied the applications and were able to do so because they could update their service using the "SUI" sites. Users downloaded the Popcorn Time applications and used them to obtain unlicensed content from other "host" sites using the BitTorrent protocol. Birss J rejected the submission that the operators of the PTAS and SUI sites authorised acts of communication to the public by the operators of the host sites [43]-[50]. However, in *Popcorn Time* the Claimants did not contend that the operators of the PTAS and SUI sites had authorised copying by users (see Birss J's comments at [47]-[50]).

67. I am satisfied, in the light of the various features set out above, that the operators of MP3Studio, which provides the Downloader App, and the other sites that link to MP3Studio, do authorise the users' infringements.

**The operators: joint tortfeasorship with users**

68. The final way the Claimants put their case is that the operators are jointly liable as tortfeasers. The principles were helpfully summarised by Arnold J in *EMI v Sky* at [71]-[73].

69. Many of the same factual conclusions that I have set out above are also material in this context. I can therefore be brief in enumerating the key features of the Site relevant to joint wrongdoing.

70. First, I am satisfied that the Infringing Sites are designed to provide a service which enables users to make infringing copies. The whole purpose of the technology they provide is to circumvent the copyright-protecting safeguards built into the streaming services. Second, the service is provided in a user-friendly fashion. Third, users have access to massive amounts of protected, commercial, material. Fourth, the greater the amount of activity on the Sites and the Downloader App the greater the prospect of profits (through advertising and payment for conversions). Fifth, the steps taken by the Sites to prevent copying of infringing content are, as already explained, wholly inadequate. The operators have clearly not adopted an effective policy to prevent copying of protected content. Sixth, the ownership and control of the Sites is deliberately obscure and confusing which leads to an inference they wish to avoid protective steps being taken by commercial rights holders.

71. I am satisfied, applying the relevant principles, that the operators of the Infringing Sites have induced, incited or procured users of the Site to commit infringements of copyright (profiting from so doing) and that they and the users act pursuant to a common design to infringe. The operators are therefore jointly liable for the infringements committed by users. Such joint liability arises both by reason of the operation of the stream ripping service on the Infringing Sites themselves (including

via sites which provide back-end services) and by the reason of the provision of the Downloader App.

*Infringement by Site operators: communication to the public*

72. In *Warner Music UK Ltd v TuneIn Inc* [2019] EWHC 2923 (Ch) ("*TuneIn*") Birss J reviewed the authorities concerning communication to the public (including Paramount). Having considered that helpful guidance, it seems to me that, for present purposes, there are three main questions. (a) Is there a communication of copyright works by way of electronic transmission? (b) Is the communication to the public? (c) Does the act of communication to the public take place in the UK? If the communication originates from outside the UK, that depends on whether it is targeted at the public in the UK.

73. As to the first question, the essential test formulated by the CJEU is whether the Site intervenes to give access to a protected work: "[A] user makes an act of communication when he intervenes, in full knowledge of the consequences of his action, to give his customers access to a protected work, particularly where, in the absence of that intervention, those customers would not be able to enjoy the broadcast work, or would be able to do so only with difficulty": *Stichting Brein v Ziggo BV and others* (Case C-610/15) at [26]. (Though the court referred in that passage to a user, its guidance covers what I am calling a site operator in this judgment.)

74. I start with the Infringing Sites that provide "conversion" services. I am satisfied, applying the guidance in *Brein*, by doing this, the Sites do make an intervention. Absent the sites intervention the relevant content would not be accessible to download except to someone who had paid to be a premium user of YouTube and even then only on the limited basis I have set out above. Hence by providing "conversion" these Sites are directly responsible for the communication of the Claimants' Recordings and Videos (and other copyright content) to the public by electronic transmission. The intervention is also active: the Sites are set up and exist to enable users to access and to download content in an easy and convenient way and the Sites encourage such downloading.

75. As for MP3Studio, which only provides the Downloader App, there is an argument that it is in the same position as the provider of the Popcorn Time app, which Birss J held was not directly liable for any communication to the public, on the basis that it did not itself transmit content but rather only provided the app which enabled the transmission: see *Popcorn Time* at [38]-[39].

76. The Claimants point out that the *Popcorn Time* decision was reached before the CJEU decisions in *Stichting Brein v Wullems (t/a Filmspeler)* (C-527/15) and *Stichting Brein v Ziggo BV and others* (Case C-610/15), which demonstrate that a party may commit acts of communication to the public even where it does not transmit content. In particular, in *Wullems*, the wrongdoer was liable for communication to the public where he had supplied hardware that came pre-installed with links to pirate sites. The Claimants submit that the provision of the Downloader App is at least analogous to that and constitutes a sufficient material "intervention". I accept that submission: it appears to me that, by parity of reasoning, although the Downloader App does not itself transmit content it amounts to an intervention, with full knowledge of the consequences, to give users access to protected works (see *Wullems* at [31]).

77. It is also relevant that the communication is of a profit-making nature: see *Paramount* at [12(13)]. As described above, the Sites carry advertising, and the Downloader App requires payment when "conversions" exceed three.

78. The second requirement under this head is that the works be communicated to the public. This has two aspects. First the works must be made accessible to a sufficiently large number of people. In this case, they are made available to the entire internet public, so this requirement is satisfied. Second the works must be made accessible either to a new public (i.e., a public which was not considered by the authors concerned when they authorised the original communication: see *Paramount* at [12(15)]) or by a different technical means from the original communication: see *Paramount* at [12(18)]. To the extent that works have been made available to be streamed on YouTube (or another platform), ripping them so as to make them available as downloads (a) constitutes a new technical means or (b) constitutes a new public because any original authorisation was in relation to YouTube (or other platforms).

79. My attention was properly drawn to the Advocate-General ("A-G")'s opinion in Joined Cases C-682/18 and 693/18 *Peterson v Google LLC* ("*Peterson*"). At [75], [86] and [93], the A-G expressed the view that a site operator which did not actively intervene by selecting the content transmitted, did not determine that content and did not in some other way present it as its own was not communicating with the public. However, the A-G recognised at [94]-[99] and [104] that his views depart from three earlier CJEU copyright decisions, including *Brein*. Since the A-G expressed his Opinion, *Brein* has been approved by the CJEU in *BY v CX* (Case C-637/19) at [23]. I accept the Claimants' submission that the Opinion (which of course does not represent the law) is therefore unlikely to be followed.

80. I accept the Claimants' submission that the CJEU's present position (illustrated by *Brein*) is that deliberate facilitation of a communication is sufficient to establish an act of communication and that this is shown if the operator had an intention when providing the service to facilitate infringements. I am satisfied that this requirement has been established here.

81. The final criterion is that the communication be targeted at the UK. The principles were conveniently set out in *TuneIn* at [16]-[17]. I am satisfied that this criterion is satisfied here. First, the default language of the Infringing Sites and the Downloader App is English. Second, the language of the advertisements which appear when the Sites are accessed, and the Downloader App used is English. Third, in the 12 months between September 2017 and August 2018 there were 76.3m UK visits to Flvto, 21.7m to 2Conv, 1.156m to Flv2mp3 and 2.42m to H2Converter. In the 18 months between June 2019 and November 2020 the equivalent figures were 77.36m to Flvto, 40.53m to 2Conv, 474,998 to Flv2mp3, 1.44m to MP3Studio and 255,920 to H2Converter. Fourth, in the US Proceedings, Mr Kurbanov has stated that Flvto and 2Conv are both "targeted at the entire world of eligible internet users". Fifth, the Downloader App is made available via these Sites. Moreover it offers pricing in GBP and enables payments to be made by a UK credit card.

82. I am satisfied that there has been infringement under this head.

**Conclusions on infringement**

83. I am therefore satisfied that there has been infringement under each of the heads alleged by the Claimants.

84. The Claimants sought in the alternative an injunction under s.37 of the Senior Courts Act 1981 to block access to Infringing Sites on the grounds that they were circumventing technological measures and otherwise infringing ss. 296ZA and 296ZD of the Act: see *Nintendo v Sky* [24]-[31].

85. In the light of my earlier conclusions it is not necessary to consider this alternative case and I shall not lengthen this judgment by doing so.

**Use of the Defendants' services to infringe**

86. It is clear that both users and operators of the Sites use the services of the Defendant ISPs to infringe the Claimants' copyrights: see *Cartier International AG v BSkyB* [2016] EWCA Civ 658 at [86]-[97].

**The Defendants' actual knowledge of infringement/circumvention**

87. The Claimants informed the IPSs of the infringing activities before the proceedings were started and have served them with the evidence in support of the Application.

88. The Defendants have been served with the evidence in support of the Application, such that there can be no doubt as to their actual knowledge of all the matters contained in that evidence. This is sufficient to establish their actual knowledge of the contents of the evidence: cf. *EMI v Sky* at [89].

**Proportionality and discretion**

89. The Court must be satisfied that the order sought is proportionate. The relevant legal principles were analysed in *EMI v Sky* at [91]ff and *Cartier International AG v BSkyB (CA)* (which, although not a section 97A case, applied similar principles) at [100]-[128]. The principles were summarised in *Nintendo* at [41] as follows: "The injunction must be (i) necessary, (ii) effective, (iii) dissuasive, (iv) not unduly costly or complicated, (v) avoid barriers to legitimate trade, (vi) a fair balance between the fundamental rights engaged, (vii) proportionate and (viii) safeguarded against abuse."

90. The order sought by the Claimants includes an express permission to anyone affected by it to apply as required by Arnold J in *FAPL v Sky* at [57] and the safeguards referred to in *Cartier No 1* at [263 and [264].

91. I consider that the order sought is proportionate for the following reasons.

92. First, I am satisfied that the injunction sought is necessary to prevent or at least reduce stream ripping. There is evidence of very substantial UK use of the Infringing Sites, much or all of which must involve the Claimants' and Members' recordings.

93. I do not think that there are realistic alternative measures which are less onerous than a blocking order. The identity and location of the operators of the Sites is obscure. Correspondence with H2Converter got nowhere. Mr Kurbanov's declaration (if true) says he is based in Russia. Seeking to pursue him (or enforce judgments of the High Court) would be very difficult. I note that various of the Infringing Sites have been

94. blocked in Italy, Russia, Denmark, Spain and Australia but infringement targeted at the UK continues.

94. I am also satisfied that the measures sought will at least seriously discourage users from accessing the target website. Previous authorities of the English Courts have recorded that blocking orders have been effective in reducing visitor numbers to target websites. Moreover the statistics I was provided with showed that previous blocking orders obtained by BPI have resulted in a very substantial reduction in UK visitors

95. I am also satisfied that it is reasonable to infer that a well-publicised blocking order will dissuade other site operators and users from embarking on stream ripping of this type.

96. As to the costs and complexity of the proposed orders: the Claimants consider it worth incurring the costs involved in protecting their rights and the incremental costs of the ISPs will be reimbursed. Blocking orders are now well-established and can be implemented without difficulty: *Nintendo v Sky* at [43(iv)].

97. I am satisfied on the evidence that there is no commercially significant legitimate use of the Infringing Sites. I have addressed this earlier in this judgment.

98. It is necessary also to consider the comparative importance of the rights that are engaged and the justifications for interfering with them. I am satisfied that stream ripping causes very substantial damage to the Claimants' and Members' intellectual property rights. There is no evidence of any commercially significant legitimate business operating from the Infringing Sites. There is no reason for thinking there will be a significant interference with users' rights of privacy or data protection. The Claimants' Recordings are of course all available to be enjoyed by ISP subscribers using legal digital music services.

99. Moreover, the evidence shows that it is not just copyrights in music recordings that are being infringed. The exploitation by the Infringing Sites of sound recordings will also involve the exploitation of the musical compositions (comprising copyright musical works and literary works) embodied in those recordings. As indicated above, videos are also being "converted".

100. The Order sought also includes an express permission to apply to anyone affected by the Order (see above).

101. I also note that the ISPs do not oppose the making of the Order and that they have agreed the terms in principle. It can therefore be taken that it is proportionate as between the parties.

102. Taking account of the various factors enumerated above, I am satisfied that it is proportionate to make the order sought.

**Conclusion**

103. I shall make the order sought by the Claimants.